# IN THE COURT OF APPEALS OF IOWA

No. 21-1703
Filed April 26, 2023

**STATE OF IOWA,**
  Plaintiff-Appellee,

**vs.**

**JESSICA NOELLE AGAN,**
  Defendant-Appellant.
_____

Appeal from the Iowa District Court for Jasper County, Brad McCall, Judge.


Jessica Agan appeals her convictions of child endangerment resulting in serious injury and neglect of a dependent person. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.**


Kent A. Simmons, Bettendorf, for appellant.

Brenna Bird, Attorney General, and Olivia Brooks and Zachary Miller, Assistant Attorneys General, for appellee.


Heard by Bower, C.J., and Vaitheswaran and Tabor, JJ.

**BOWER, Chief Judge.**

Jessica Agan appeals her convictions of neglect of a dependent person and child endangerment resulting in serious injury, challenging the sufficiency of the evidence for each offense and asserting the district court abused its discretion when ruling on her motion for new trial. We reverse her child-endangerment conviction, affirm her conviction for neglect of a dependent person, affirm the district court's ruling on the motion for new trial, and remand for resentencing.

**I. Background Facts & Proceedings.**

Jessica and her husband Stormy are the parents of C.A., who was born in August 2020, and J.A., who was born in the spring of 2019. Stormy worked for his dad installing windows and siding, often working or traveling twelve to sixteen hours a day, five days a week. Jessica did most of the housework around their apartment, attended school online, and returned to work full-time in mid-November. The children started attending daycare on November 16, 2020.[1]

In October 2020, Jessica began observing what appeared to be bruises on C.A. According to Jessica, C.A. did not react when the marks were touched and the discolorations behaved differently from normal bruises. In addition to the discolorations, she reported the child was "not wanting to eat and fussy" and was hard to wake up. She began taking photographs of the marks, which she shared with Stormy and Stormy's mother. She also did some online research and took C.A. to see a pediatrician. The pediatrician noted, "Do not suspect trauma at this time." The doctor advised her to be gentle with the child. The doctor ordered blood

---

[1] The children attended daycare on November 16, 18, 19, and 23.

tests, checking for an underlying medical reason for the bruising; the test results did not show a condition that might explain the easy bruising. The doctor ordered additional testing after more bruises were visible at a November 9 well-child appointment, but those tests also came back normal. The doctor testified he observed no concerning behaviors between Jessica and C.A. and would have reported if there was any indication of trauma. C.A. was free from marks from November 9 until the 19th, when new marks appeared on his right arm while at daycare.

On November 24, Jessica brought C.A. to the emergency room, arriving around 5:30 p.m. The nurse noticed a fresh red spot on the back of C.A.'s left shoulder, and an x-ray was taken of the shoulder and arm.[2] The x-ray showed a fracture in the middle of the child's upper left arm. A full-body scan taken later that evening revealed an older, healing rib fracture.[3]

Jessica told the attending nurse and doctor the eighteen-month-old sibling grabbed C.A.'s arm when she was changing his diaper and she heard a pop. When she tried to feed C.A. later, he was fussy and she noticed the baby's arm was limp. She then decided to bring him to the hospital. The medical professionals determined Jessica's story was not consistent with the injuries and, as mandatory reporters, notified the Iowa Department of Health and Human Services (DHHS).

---

[2] No bruising was apparent on the child's arm that evening or the next day.
[3] A healing tibia fracture was also identified two weeks later after another full-body scan to monitor the child's condition was performed. The pediatric radiologist testified the parents could have had a normal routine with the child without awareness of the rib or tibia fractures or unusual fussiness from the child.

A DHHS investigator and police officer interviewed Jessica at the hospital. She said the arm-pulling incident occurred around 4:30 p.m., after she returned from an appointment and noticed the limp arm when she started to undress the child for a bath. She also explained C.A.'s history of bruising. The investigator and officer went to the Agans' home, where Stormy relayed a similar story—Jessica had been updating Stormy via text messages and phone calls while at the hospital and told him what she told investigators. Stormy also told the officer and investigator that when Jessica went to her appointment, he held C.A. while watching television; C.A. wouldn't eat from the bottle but did fall asleep while held. Stormy also told the officer and investigator about the testing they had done concerning the bruising. The officer indicated to Stormy the arm fracture did not match the story they were telling.

When the officer returned to the hospital, Jessica changed her explanation, stating, "I've already gone through this with one kid, and I'm not making the mistake with this one." She then told the officer and the nurse that while she was doing dishes that morning and Stormy was playing a video game, C.A. started crying. Stormy went to console the baby, and when he picked him up, he heard a "pop" and said, "Wow, that was really loud." Jessica said their older child had loose joints that would pop in a similar way without harm. The baby didn't really cry after the pop but was acting fussy. Late that afternoon, Jessica thought the baby was just crabby, but when she removed the over-sized sweater the baby had been wearing all day, she noticed his left arm was limp. She took the baby to the hospital while Stormy stayed home with the older child.

At trial, Jessica and Stormy testified they thought the child's arm was broken the day before by daycare workers.

Jessica was charged with one count of neglect of a dependent person and three counts of child endangerment resulting in serious injury, one count each specifying a fractured rib, fractured arm, and fractured tibia.[4]  Following a joint trial in September 2021, a jury convicted Jessica of neglect of a dependent person and child endangerment resulting in serious injury—fractured arm.  Jessica and Stormy each filed a motion for judgment of acquittal and motion for new trial, asserting the verdicts were "contrary to the law and the weight and sufficiency of the evidence presented."  The court overruled the motions.

Jessica appeals, challenging the sufficiency of the evidence to support her convictions and asserting the court abused its discretion in its interpretation of the evidence when considering her motion for new trial.

**II. Standard of Review.**

Sufficiency-of-the-evidence claims are reviewed for correction of errors at law.  *State v. Ernst*, 954 N.W.2d 50, 54 (Iowa 2021).  "[T]he State must prove every element of the crime charged beyond a reasonable doubt."  *State v. Williams*, 674 N.W.2d 69, 71 (Iowa 2004).  "We consider all evidence, not just the evidence supporting the conviction, and view the evidence in the light most favorable to the State . . . ."  *Ernst*, 954 N.W.2d at 54.  "The State's evidence must 'raise a fair inference of guilt and do more than create speculation, suspicion, or conjecture.'"

---

[4] Stormy was also charged with the same four offenses and was found guilty of the same two offenses after the joint jury trial.  A panel of this court affirmed his convictions in *State v. Agan*, No. 21-1702, 2022 WL 17481838, at *1 (Iowa Ct. App. Dec. 7, 2022).

*Williams*, 674 N.W.2d at 71 (citation omitted). The finding of guilt must be supported by substantial evidence, that is, evidence sufficient to "convince a rational fact finder the defendant is guilty beyond a reasonable doubt." *Ernst*, 954 N.W.2d at 54 (citation omitted).

"We generally review rulings on motions for new trial asserting a verdict is contrary to the weight of the evidence for an abuse of discretion." *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). "The weight-of-the-evidence standard requires the district court to consider whether more 'credible evidence' supports the verdict rendered than supports the alternative verdict." *Id.* (citation omitted). "The question for the court is not whether there was sufficient credible evidence to support the verdict rendered or an alternative verdict, but whether 'a greater amount of credible evidence' suggests the verdict rendered was a miscarriage of justice." *Id.* (citation omitted). "[A] district court may invoke its power to grant a new trial on the ground the verdict was contrary to the weight of the evidence only in the extraordinary case in which the evidence preponderates heavily against the verdict rendered." *Id.*

**III. Analysis.**

*A. Child endangerment resulting in serious injury.* Jessica challenges several elements supporting her conviction of child endangerment resulting in serious injury—fractured arm. For this conviction, the jury had to find the State proved all of the following elements:[5]

> 1. On or about November 24, 2020[,] the defendant was the parent of [C.A.].

---

[5] The lesser-included offenses—child endangerment resulting in bodily injury and child endangerment without injury—were not submitted to the jury.

2. [C.A.] was under the age of fourteen years.

3. The defendant acted with knowledge that he or she was creating a substantial risk to [C.A.]'s physical health or safety.

4. The defendant's act resulted in serious injury to [C.A.], to wit: a fractured arm.

If the State has proved all of the elements, the defendant is guilty of Child Endangerment. If the State has failed to prove any one of the elements, the defendant is not guilty of Child Endangerment.

Jessica asserts there is insufficient evidence she acted with knowledge she was creating a substantial risk to C.A.'s physical health or safety and the child's injury does not meet the definition of "serious injury." The State asserts the jury could have found Jessica aided and abetted the child-endangerment charge, effectively conceding substantial evidence does not support her conviction as the perpetrator of the child's fractured arm.[6] Therefore, we will only examine whether the State proved Jessica aided and abetted in child endangerment resulting in an arm fracture.

The jury's instruction as to the requirements for aiding and abetting stated,

All persons involved in the commission of a crime, whether they directly commit the crime or knowingly "aid and abet" its commission, shall be treated in the same way.

"Aid and abet" means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed. Conduct following the crime may be considered only as it may tend to prove the defendant's earlier participation. Mere nearness to, or presence at, the scene of the crime, without more evidence, is not "aiding and abetting." Likewise, mere knowledge of the crime is not enough to prove "aiding and abetting."

---

[6] In closing argument, the prosecutor asked the jury to find Jessica "guilty of causing the rib fracture and the bruising," and to find Stormy guilty of the arm fracture. In rebuttal closing, the prosecutor asked the jury to find Jessica guilty of neglect of a dependent person and child endangerment resulting in serious injury for the rib and tibia fractures, but he again only mentioned Stormy in relation to the arm fracture.

The guilt of a person who knowingly aids and abets the commission of a crime must be determined only on the facts which show the part he or she has in it, and does not depend upon the degree of another person's guilt.

If you find the State has proved the defendant directly committed the crime, or knowingly "aided and abetted" the other defendant in the commission of the crime, then the defendant is guilty of the crime charged.

The instruction clearly requires action, either by active participation or by knowing encouragement before or during the conduct, for a conviction under the aiding and abetting theory. "[T]he State must prove the accused knew of the crime at or before its commission." *State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994). The State asserts there is evidence Jessica knew of the crime as it was committed and there is circumstantial evidence of "presence, companionship, and conduct before and after the offense," *id.* (citation omitted), which in combination adequately support her conviction as an aider and abettor. The State notes Jessica "was present during the arm fracture; was associated with the perpetrator by marriage exposing her to his anger issues; and lied to medical personnel, a [DHHS] worker, and law enforcement about how C.A. broke his arm, only changing her story once caught in the lie."

Even viewed in the light most favorable to the State, the evidence here is not sufficient to support an aiding and abetting conviction for child endangerment resulting in serious injury. The jury was clearly instructed that mere presence is not sufficient for a conviction, nor do we consider her marriage to the perpetrator sufficient for conviction. Jessica's conduct the State asserts supports her conviction occurred *after* the child's injury—several hours later under the State's argument. As the jury was instructed, aiding and abetting requires action by the

accused "before or when [the offense] is committed." *See State v. Hustead*, 538 N.W.2d 867, 869–70 (Iowa Ct. App. 1995) ("It is essential that the aider and abettor have knowledge of the perpetrator's criminal activity prior to its commission. An accused may not be convicted as a principal on the theory of aiding and abetting for conduct that only supports an accessory after the fact." (internal citation omitted)). The evidence does not establish Jessica participated in or knowingly advised or encouraged the conduct resulting in the child's fractured arm before or during the act.

Consequently, there is not substantial evidence to support Jessica's conviction for aiding and abetting child endangerment resulting in serious injury.

*B. Neglect of a dependent person.* To find Jessica guilty of neglect of a dependent person, the jury had to find the State proved all of the following elements:

> 1. Between August 26, 2020[,] and November 24, 2020, the defendant was the parent of [C.A.].
> 2. [C.A.] was under the age of fourteen years.
> 3. The defendant knowingly or recklessly exposed [C.A.] to a hazard or danger against which [C.A.] could not reasonably be expected to protect himself.

Jessica challenges the sufficiency of the evidence supporting the final element—she "knowingly or recklessly exposed C.A. to a hazard or danger." The jury was instructed,

> [A] person is "reckless" or acts "recklessly" when he or she willfully disregards the safety of persons or property. It is more than a lack of reasonable care which may cause unintentional injury. Recklessness is conduct which is consciously done with willful disregard of the consequences. For recklessness to exist, the act must be highly dangerous. In addition, the danger must be so obvious that the actor knows or should reasonably foresee that harm

will more likely than not result from the act. Though recklessness is willful, it is not intentional in the sense that harm is intended to result.

In considering recklessness, "[w]e simply look to whether the actor embarked on an activity which is known, or should be known, to pose a substantial risk to others." *State v. Conroy*, 604 N.W.2d 636, 638 (Iowa 2000).

The State offers two theories to support Jessica's conviction here: she knowingly exposed the child to danger by aiding and abetting the arm fracture, or she knowingly or recklessly caused or allowed the bruises to C.A. in October and November 2020. Because we reversed her child-endangerment conviction above, we now consider this argument in the context of Jessica recklessly exposing the child to harm.

The arguments here essentially pose a question: did the evidence presented support a fair inference of knowing or reckless exposure to harm, or was the conviction based on speculation, suspicion, or conjecture? *See Williams*, 674 N.W.2d at 71.

It is undisputed Jessica was C.A.'s primary caregiver for the vast majority of the time when C.A. showed bruising and when the fractures occurred—with some help from Stormy. Text messages between Jessica and Stormy showed both parents expressing moments of frustration with the children and each other. In the months after the children were removed from Stormy and Jessica's care, the caretakers did not notice any new bruises developing on C.A., nor were there new fractures. During her second interview at the hospital, Jessica stated "I've already gone through this with one kid, and I'm not making the mistake with this one," before changing her explanation of the cause of the injury. The State also

presented text messages showing Jessica's frustration at times caring for an infant and toddler. The jury could reasonably infer C.A. was getting bruised from either Jessica's or Stormy's care, Jessica knew the child was at risk of harm, and Jessica knowingly or recklessly exposed the child to further injury through her treatment of the child or by failing to protect the child from Stormy's care.

Jessica emphasizes the evidence showing her confusion concerning how C.A. was getting bruised. In the month the bruises appeared, she sought help from her mother-in-law and C.A.'s pediatrician, she had blood testing done, and she and Stormy handled the child more gently. All of the evidence presented to the jury regarding the child's bruises came from Jessica documenting the bruises in an effort to determine the underlying cause, get the child treatment, and prevent or mitigate further bruising.

Because we review sufficiency-of-the-evidence challenges only for correction of errors of law, we consider all the evidence in the light most favorable to the State. *See Ernst*, 954 N.W.2d at 54. We find the totality of the circumstances here raises a fair inference Jessica recklessly exposed the child to danger. Substantial evidence supports the jury's verdict convicting Jessica of neglect of a dependent person, and we affirm.

*C. Motion for new trial.* Jessica asserts the court relied on untenable and unreasonable interpretations of the evidence when ruling on her motion for new trial. She points to five separate statements by the court that she claims are based on suspicion and conjecture rather than legitimate inferences.

The objected-to statements from the court's analysis are:

Significantly, during the first three months of his life C.A. experienced repeated, unexplained bruising in addition to the three fractures. . . .

Medical testimony established there was no medical explanation for the fractures other than abuse. In fact, the medical testimony established the fracture to C.A.'s tibia, known as a classic metaphyseal lesion (CML) fracture, is a specific indicator of abuse and is known to be caused by a shaking mechanism in non-ambulatory infants.

Photographic evidence, taken both by the Defendants with their cell phones and by an employee at a day care C.A. was taken to, establish C.A. did not have a fracture to his humerus before November 24, 2020. . . .

Both Defendants lied to hospital and law enforcement authorities as to the mechanism of injury to C.A.'s arm. . . .

Text messages between the Defendants in the months leading up to November 24, 2020[,] corroborate the jury's decision. The messages paint the picture of a young couple expressing profound frustration in attempting to take care of their two young sons. In one exchange, shortly before Jessica took C.A. to see a doctor, Stormy sent a text to Jessica stating "I hope nobody turns us in. I'm a 21-year-old drop out with anger issues." Jessica responded "they don't know that."

When considering the motion for new trial, the district court ruled,

Considering the weight of the evidence and the testimony presented at trial, including a consideration of the credibility of the witnesses who testified, specifically including each of the Defendants, the undersigned finds that the jury verdict finding the Defendants guilty . . . is not contrary to the weight of the evidence.

Of the challenged statements, we agree the third statement has some logical issues. The fracture was never visible from looking at the child's arm, and the child did not have bruising on the arm even the day after the break was discovered. The State implies the child was content in the photos and upset after the fracture, yet photos from the afternoon after the State's suggested time of fracture have C.A. sleeping peacefully, and in the bodycam video evidence, the child is sleeping quietly rather than in a state of upset. While this evidence is more

conjecture than legitimate inference, our reversal of the child-endangerment conviction means any error would have been harmless.

Although the evidence supporting the other statements could have been interpreted in a manner weighing less heavily in favor of conviction, they were drawn directly from the evidence presented, and the district court did not abuse its discretion in its reasoning or credibility determinations.

We reverse Jessica's conviction for child endangerment resulting in serious injury, affirm her conviction for neglect of a dependent person, affirm the district court's ruling on motion for new trial, and remand for resentencing.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.**